STEPHANIE M. HINDS (CABN 154284)
United States Attorney

THOMAS A. COLTHURST (CABN 99493)
Chief, Criminal Division

ANKUR SHINGAL (CABN 303434)
Assistant United States Attorney

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-7108
    FAX: (415) 436-7234
    Ankur.Shingal@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 22-70418 MAG |
| Plaintiff, | **GOVERNMENT'S DETENTION MEMORANDUM** |
| v. | |
| JOSE ALVARADO, | |
| Defendant. | |

# INTRODUCTION

"Don't die."

That's what the defendant, Jose Alvarado, said to an undercover officer when he sold the officer 6.9 grams of fentanyl[1] on November 30, 2021. Alvarado knew the fatal effects of what he was peddling, and sold the fentanyl anyway. But Alvarado's sales were not limited to that one incident. Far from it: since that date through February 10, 2022, Alvarado was involved in four control buys with undercover officers and sold them approximately 134 grams of fentanyl and 35 grams of methamphetamine. When Alvarado was arrested and his residence was searched, officers located additional drugs—408 grams of fentanyl and 113 grams of methamphetamine—and nearly $40,000 in cash.

That Alvarado knew he was essentially selling poison is not surprising: in 2020 and 2021, approximately 1,300 people died from drug overdoses in San Francisco—nearly twice the number who died from COVID-19 over that period. About three quarters of those overdose victims—or about 1,000 people—had fentanyl in their systems.[2] It should come as no surprise that one of the hardest hit neighborhoods in this crisis was the Tenderloin. The despair wrought by the sale of fentanyl, methamphetamine, and other toxic drugs is evident simply by gazing out the windows of this courthouse, or walking just a few feet outside its doors. The catastrophic effect that these drugs—particularly fentanyl—have had on the City and these neighborhoods prompted Mayor London Breed to declare a state of emergency in the Tenderloin and the surrounding area on December 17, 2021.[3] As the Mayor stated in her announcement of the emergency declaration, the "rapidly deteriorating conditions in the Tenderloin caused by the opioid crisis put the lives of San Franciscans in serious risk."

It is drug traffickers like Alvarado, who commuted to the Tenderloin from Oakland 6 days a week based on evidence obtained through federal process to essentially work his shift of drug dealing,

---

[1] All weights referred to in this memorandum are gross weights.

[2] Trisha Thadani, et al., *San Francisco's fentanyl crisis: A disaster in plain sight*, S.F. Chron., Feb. 2, 2022 (https://www.sfchronicle.com/projects/2022/sf-fentanyl-opioid-epidemic/).

[3] "Mayor London Breed Declares State of Emergency in the Tenderloin," Dec. 17, 2021 (https://sfmayor.org/article/mayor-london-breed-declares-state-emergency-tenderloin). On December 23, 2021, the San Francisco Board of Supervisors voted to approve Mayor Breed's Emergency Declaration in the Tenderloin. *See* "Board of Supervisors Approves Mayor London Breed's State of Emergency Declaration in the Tenderloin," Dec. 23, 2021 (https://sfmayor.org/article/board-supervisors-approves-mayor-london-breed%E2%80%99s-state-emergency-declaration-tenderloin).

that are driving this human tragedy. Indeed, his dealing is not limited to this case: Alvarado has prior convictions related to drug dealing and has been arrested a multitude of times for trafficking.

In sum, the defendant poses a substantial and serious risk to the lives of San Franciscans and, in particular, the residents, businesses, and employees working in the Tenderloin. No conditions of release will assure the safety of the community or the appearance of his appearance. As such, it is imperative that Alvarado be detained as both a danger to the community and a flight risk.

## BACKGROUND

**I.     The Nature and Circumstances of the Underlying Offense Weigh in Favor of Detention**

    **A.     On November 30, 2021, Alvarado sold UC-1 6.9 grams of fentanyl**

On November 30, 2021, San Francisco Police Department (SFPD) officers conducted an undercover operation focused on Alvarado, who was a known fentanyl dealer. At around 4:30 PM near the intersection of Eddy and Polk Streets, an undercover officer (UC-1) approached Alvarado and said "Fent? Yellow." Alvarado indicated that he had fentanyl, and after UC-1 gave him $40 in cash, pulled out a clear plastic baggie from his clothes. Alvarado then weighed the fentanyl on a small scale and handed the drugs to UC-1, as he said "*don't die*." While Alvarado was weighing the drugs, UC-1 asked for his phone number. Alvarado provided a number ending in -9130, and also told UC-1 that his nickname was "Chepe."

Subsequent drug processing indicated that the drugs weighed 6.9 grams and tested presumptively positive for fentanyl.

    **B.     On January 13, 2022, Alvarado sold 12.3 grams of fentanyl and 7.1 grams of methamphetamine to law enforcement**

On January 13, 2022, a different undercover officer (UC-2) contacted Alvarado via Alvarado's number ending in -9130. After exchanging recorded text messages and phone calls in which Alvarado gave updates on his ETA and his location, UC-2 met with Alvarado near Eddy and Larkin Streets in the Tenderloin. UC-2 purchased $200 of fentanyl and $100 of methamphetamine from Alvarado.

The suspected fentanyl weighed 12.3 grams and presumptively tested positive. The suspected methamphetamine likewise tested positive and weighed 7.1 grams.

    **C.     Only one week later, Alvarado again sold 54.7 grams of fentanyl to another undercover officer**

On January 20, 2022—only one week after the prior sale—another undercover officer (UC-3) contacted Alvarado via phone.  UC-3 video recorded his calls and interactions with Alvarado.  Specifically, UC-3 asked Alvarado on the phone if he had 2 ounces of fentanyl.  Alvarado confirmed that he did, and told the UC-3 to meet him at the interaction of Ellis Street and Van Ness Avenue.

Later that day, UC-3 drove his unmarked police car to that intersection.  UC-3 contacted Alvarado, and Alvarado walked up to the driver's side window of the vehicle and handed UC-3 the drugs.  UC-3's video clearly captured Alvarado watching UC-3 count the money for the drug sale:



As a separate video produced in discovery reflects, Alvarado then entered the passenger's side of UC-3's car, at which point UC-3 handed him $1,000 for the drugs.

The suspected fentanyl subsequently tested presumptively positive and weighed 57.4 grams, which is approximately 2 ounces.

    **D.**    **On February 10, 2022, Alvarado sold 57.3 grams of fentanyl and 28 grams of methamphetamine to UC-3**

About three weeks later, Alvarado *again* sold drugs to UC-3.  On February 10, UC-3 contacted

Alvarado via Alvarado's cell phone. UC-3 told Alvarado that he wanted "fent" and "crystal," referring to fentanyl and methamphetamine. Alvarado directed UC-3 to meet him at the corner of Golden Gate Avenue and Polk Street.

UC-3 met Alvarado at that location. Alvarado, who was wearing a bright pink backpack, got into the front passenger's seat of UC-3's car, and told him to drive to another location on Turk Street. At the new location, UC-3 requested two ounces of fentanyl and one ounce of methamphetamine. Alvarado retrieved the drugs from his person, and exchanged them with UC-3 for $1,200. Alvarado then left. Unbeknownst to Alvarado, UC-3 had audio-recorded the entire interaction.

The suspected fentanyl subsequently tested presumptively positive and weighed 57.3 grams, which is approximately 2 ounces. The suspected methamphetamine likewise testified positive and weighed 28 grams, or approximately 1 ounce.

  **E.** **Law enforcement arrests and searches Alvarado and his residence on March 31, 2022, finding more drugs and nearly $40,000 in cash**

On March 31, 2022, pursuant to a federal arrest warrant and search warrants, law enforcement planned to Alvarado outside of his residence in Oakland.

At around 12:05 PM that day, officers observed Alvarado and two other individuals leave his residence. Alvarado was wearing, among other things, a bright pink backpack. Officers then detained and arrested Alvarado, and searched his person and his backpack. From his person, officers seized $65 in cash and 45.36 grams of methamphetamine. They also searched his backpack, and found an additional 408.4 grams of fentanyl.

Officers searched Alvarado's residence, and discovered a black plastic bag located right outside of the kitchen window, in the neighbor's roof gutter. The bag was only an arm's length away from the window. Inside of the black bag, officers found 113.4 grams of multi-colored fentanyl. The fentanyl was packaged in a similar manner as the drugs discovered inside of Alvarado's pink backpack. In addition to the drugs, officers searched the various rooms of the residence, and located $38,360 in cash in total, along with indicia of Alvarado's use of those rooms.

**F.   Physical Surveillance, Historical Location Data, and Ping Data Confirm that Alvarado Commuted from Oakland into San Francisco, and specifically the Tenderloin, to sell drugs as his source of income**

In a perverse way, Alvarado was like thousands of other people who commute into San Francisco to work a shift. But unlike the construction worker, the teacher, or the technology professional, whose work contributes to the welfare of society, Alvarado peddled toxic drugs to those gripped by addiction. And he did so for a profit.

Through physical surveillance both on the days of the controlled buys and others, historical location data, and active cell phone ping data, law enforcement investigation has confirmed that Alvarado would often drive directly from Oakland to San Francisco and back multiple times a week—sometimes as often as 6 times a week—to sell drugs. Indeed, his text messages from his case confirm as much, as he was seemingly able to come into San Francisco at any time as if he was on call:



Moreover, based on returns from the California Employment Development Department, the EDD does not have any wage records for Alvarado from January 2019 to April 2021, indicating that illegally selling drugs was *his sole source of income*.

### G. Alvarado's criminal history, replete with convictions and drug-related arrests, supports detention

Alvarado has a litany of arrests and two prior convictions, both of which appear related to drug-trafficking activity. The government summarizes the offense conduct based on the reports currently in

its possession:

- <u>February 23, 2017 arrest</u>: Alvarado is observed at the intersection of Golden Gate Ave and Hyde Street.  When law enforcement approached him, he ran.  He was eventually detained and searched, and officers found suspected cocaine base, heroin, marijuana, methamphetamine, in addition to $705 in cash.

- <u>February 26, 2017 arrest and subsequent conviction</u>: Three days later, Alvarado again ran when law enforcement approached him in the Tenderloin.  After the chase was over and as he was being detained, officers saw Alvarado spit suspected cocaine base out of his mouth.  Officers also found a sock in the chase area, which contained multiple individually-wrapped rocks of cocaine base and heroin.  They also found marijuana and $371 in small denominations in Alvarado's hoodie.  On May 5, 2017, Alvarado was found guilty of a violation of California Penal Code § 32 related to this conduct and sentenced to 2 years' probation.

- <u>April 4, 2017 arrest</u>: officers approached Alvarado to speak with him near the intersection of Golden Gate Avenue and Hyde Street, and Alvarado *again* fled.  They arrested and searched him, and found $730.30 on his person.

- <u>March 18, 2018 arrest</u>: officers detained Alvarado pursuant to his probation search condition near United Nations Plaza.  During the probation search, officers found 32.7 grams of suspected cocaine base, 32.8 grams of suspected black tar heroin, and 4.0 grams of suspected methamphetamine.

- <u>May 31, 2019 conviction</u> – Alvarado was sentenced to 3 years' probation for a violation of California Penal Code § 32 (accessory after the fact).  Although the government does not have the underlying police report at this time, the conviction appears related to drug-trafficking conduct per his rap sheet.

- <u>October 30, 2019 arrest</u> – officers approached Alvarado near 390 Golden Gate Avenue.  Based on two stay-away orders that were active—one to stay at least 150 yards away from Hyde Street and Golden Gate Avenue, and the other to stay at least 150 yards away from Golden Gate Avenue and Larkin Street—officers arrested Alvarado.

- <u>November 12, 2020 arrest</u> – a surveilling officer saw Alvarado engage in multiple drug

transactions near Hyde Street and Golden Gate Avenue. He then arresedt Alvarado, who told the officer the location of his (Alvarado's) a plastic sack containing suspected fentanyl. A subsequent search of Alvarado revealed $3,254 in small denominations, a scale, and multiple small press lock baggies.

- <u>February 28, 2021 arrest</u> – after observing a number of narcotics transactions between Alvarado and other individuals near Golden Gate Avenue and Hyde Street, officers arrested and searched Alvarado. They found 32.2 grams of white-colored fentanyl, 15.2 grams of green-colored fentanyl, 2.6 grams of purple-colored fentanyl, 10.8 grams of pink-colored fentanyl, methamphetamine, and 2 digital scales. They also found a total of $1,400 in small denominations on his person.

## LEGAL STANDARD

The Bail Reform Act of 1984 permits pretrial detention of a defendant without bail where "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e)(1). Detention is appropriate where a defendant is either a danger to the community or a flight risk; it is not necessary to prove both. *United States v. Motamedi*, 767 F.2d 1403, 1406 (9th Cir. 1985). A finding that a defendant is a danger to the community must be supported by clear and convincing evidence. 18 U.S.C. § 3142(f)(2)(B). A finding that a defendant is a flight risk need only be supported by a preponderance of the evidence. *Motamedi*, 767 F.2d at 1406. "[T]he Bail Reform Act mandates an [1] individualized evaluation [2] guided by the factors articulated in § 3142(g)." *See United States v. Diaz-Hernandez*, 943 F.3d 1196, 1199 (9th Cir. 2019). Categorical grants or denials of bail, not tethered to an individualized determination, are impermissible. *Id*. Consideration of factors outside the articulated factors set forth in Section 3142 is also disfavored. *Id*.

Where there is probable cause that a defendant has violated the Controlled Substances Act and faces a maximum of 10 years in person or more (as here), courts apply a rebuttal presumption against the defendant that no condition or combination of conditions reasonably will assure the defendant's appearance as required and the safety of the community. *See* 18 U.S.C. § 3142(e)(3)(A). Under this scheme, the burden of production then shifts to the defendant. *United States v. Hir*, 517 F.3d 1081, 1086

(9th Cir. 2008).  Although the presumption is rebuttal, it is not a "bursting bubble." *United States v. Jessup*, 757 F.2d 378, 382-383 (1st Cir. 1985) (Breyer, J.), *abrogated on other grounds by United States v. O'Brien*, 895 F.2d 810 (1st Cir. 1990).  In other words, the presumption is not so weak that if a defendant introduces evidence, "the presumption 'bursts' and totally disappears, allowing the judge (or jury) to decide the question without reference to the presumption." *Id*. (further stating that such an approach would "render the presumption virtually meaningless" because a defendant can "always provide the magistrate with *some* reason" (emphasis added)).  Even if the defendant rebuts the presumption, the presumption is not erased; instead, it remains in the case as an evidentiary finding militating against release that is to be weighted along with other relevant factors. *See U.S. v. King*, 849 F.2d 485 (11th Cir. 1988); *accord United States v. Ward*, 63 F. Supp. 2d 1203, 1209 (C.D. Cal. 1999) (citing *Jessup*, 757 F.2d at 389).

If the court concludes that the defendant has rebutted the statutory presumption of detention, the court must consider four factors in determining whether the pretrial detention standard is met:  (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant, including the defendant's character, physical and mental condition, family and community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings, as well as whether the crime was committed while the defendant was on probation or parole; and (4) the nature and seriousness of the danger to any person or to the community that would be posed by the defendant's release.  18 U.S.C. § 3142(g); *United States v. Winsor*, 785 F.2d 755, 757 (9th Cir. 1986).

## ARGUMENT

### I.    Alvarado is subject to a rebuttal presumption

Alvarado is charged with two violations of 21 U.S.C. § 841(a)(1) and (b)(1)(B) for possession with intent to distribute and distribution of fentanyl and methamphetamine, each of which carries a maximum penalty of 40 years' imprisonment.  As such, Alvarado is subject to the rebuttal presumption in favor of detention.  *See* 18 U.S.C. § 3142(e)(3)(A).  In order to overcome this presumption, Alvarado bears the burden of production that he is *both* not a flight risk and that his release will not endanger the community.  As discussed below, Alvarado will be unable to overcome the presumption against him.

**II.     Alvarado should be detained as a danger to the community**

The devastating effects of Alvarado's conduct in the Tenderloin cannot be understated: as Mayor Breed stated in her announcement of the Tenderloin Emergency Intervention Plan, "We are losing over two people a day to drug overdoses, mostly to fentanyl, and mostly in the Tenderloin and SoMa. This is a public health emergency demanding a crisis level response, with massive urgency, coordination, and determination to confront this epidemic."[4]

For Alvarado, though, distributing drugs—and particularly harmful ones in fentanyl and methamphetamine—is his chosen occupation and an opportunity to make money. Over the few months that Alvarado interacted with law enforcement in this investigation, he sold a total of 133.9 grams of fentanyl and 35.1 grams of methamphetamine. And even that says nothing of the *additional* 45.36 grams of methamphetamine and 521.8 grams of fentanyl that law enforcement found during his arrest and search of his residence.

That is a *staggering* quantity of illicit drugs, particularly given that the DEA estimates that a mere two milligrams of fentanyl—or 0.002 grams—can be lethal depending on a person's body size, tolerance, and past usage. Below is a depiction of what 2 milligrams—i.e., a deadly dose—of fentanyl looks like:



Taking the fentanyl that he actively sold to the UCs and fentanyl recovered during his arrest and search, Alvarado possessed or sold nearly *300,000 times* that amount of fentanyl.

---

[4] "Mayor London Breed Declares State of Emergency in the Tenderloin," Dec. 17, 2021 (https://sfmayor.org/article/mayor-london-breed-declares-state-emergency-tenderloin).

And it is not as if Alvarado did not know what he was doing. As discussed above, he has been arrested multiple times for drug-related conduct, and has two prior convictions stemming for drug-trafficking incidents. Further, the fact that he told UC-1 *"Don't die"* underscores Alvarado's callousness: he knew he was peddling fatal drugs and did not care as long as he got paid.

Alvarado has also demonstrated an apparent determination to deal in the Tenderloin, despite living in Oakland. The four controlled buys in this case fall into a years-long pattern of drug trafficking in the area regardless of numerous arrests, stay away orders, and prior convictions. His "continuing involvement with the distribution of drugs" militates in favor of detention. *United States v. Wolf*, No. 5:15-CR-00263-EJD, 2015 WL 4573039, at *3 (N.D. Cal. July 29, 2015); *United States v. Fulgham*, Case No. CR 12–0124 CW (KAW), 2012 WL 2792439, at *4 (N.D. Cal. July 9, 2012) ("The Senate Report states: The Committee also emphasizes that the risk that a defendant will continue to engage in drug trafficking constitutes a danger to the 'safety of any other person or the community.' Defendant's tendency to repeatedly commit similar crimes shows that he poses an unmitigable danger to the community.").

### III. Alvarado is a serious flight risk

Not only does the Alvarado present a serious risk to the community, but he is also a flight risk. For the first time in his drug dealing career, Alvarado is facing real and serious consequences, including a mandatory minimum. The prospect of a federal conviction and years in a federal prison provide him with significant motivation to escape the consequences of his actions and flee.

As if that were not sufficient motivation, this case has stripped Alvarado of his livelihood. Drug dealing is how Alvarado makes his living. The government is not aware of any meaningful ties to the community, aside from his relationships with his customers. Without the ability to profit off of the addiction that keeps money flowing into his pocket, the defendant has little incentive to remain here and to answer for his offenses.

Finally, there is simply no viable place to which the defendant can be released. The defendant lives in a stash house with other drug dealers who were arrested by the state. The house was full of cash in small denominations and significant amounts of drugs. And there is no guarantee that if released to a halfway house, Alvarado will not simply walk away—indeed, he has run from police numerous times in

the past and defied stay-away orders time and again.  Without a job (he cannot return to drug dealing) or housing (he should not be permitted to return to the stash house), the risk that Alvarado will flee is too great to allow his release.

## CONCLUSION

For the foregoing reasons, the Court should grant the government's motion to detain Alvarado pending trial.

DATED:  April 4, 2022                                          Respectfully submitted,

                                                             STEPHANIE M. HINDS
                                                             United States Attorney

                                                             _____/s/_____
                                                             ANKUR SHINGAL
                                                            Assistant United States Attorney